J-S48016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1414 EDA 2019 |

Appeal from the Decree Entered April 10, 2019
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): No. 2018-A0162

BEFORE: BOWES, J., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SHOGAN, J.: **FILED OCTOBER 22, 2019**

N.S. ("Father") appeals from the decree entered on April 10, 2019,
granting the petition filed by T.L. ("Mother") and her husband, A.G.
("Stepfather"), to terminate Father's parental rights to his son, T.M.S., born
in February of 2007, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1),
(2), and (b). We affirm.

On September 1, 2018, Mother and Stepfather filed a petition to
terminate Father's parental rights to T.M.S. so that Stepfather can adopt

---

[*] Retired Senior Judge assigned to the Superior Court.

T.M.S. The trial court held an evidentiary hearing on April 10, 2019. Mother, Stepfather, and Father testified at the hearing.[1]

We note initially that neither counsel for T.M.S. nor counsel for Mother has elected to file a brief, and the trial court dictated its findings at the conclusion of the hearing. This Court benefits when the parties and the trial court present their views with citation to the record and to relevant law. Given these omissions, we detail the evidence presented at the hearing prior to our discussion of the disposition of this case.

_____

[1] We observe that the trial court appointed Attorney Louise Petrillo to represent T.M.S.'s legal interests and stated that it did not appoint a guardian *ad litem* ("GAL") because there is no conflict in T.M.S.'s legal interests and best interests. N.T., 4/10/19, at 112. *See In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality) (23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding). The *L.B.M.* Court defined a child's legal interest as synonymous with the preferred outcome. *Id.* at 432; *see also In re T.S.*, 192 A.3d 1080 (Pa. 2018) (trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). Herein, Attorney Petrillo testified that she interviewed T.M.S., who was twelve years old at the time of the hearing, and T.M.S. wanted Stepfather to adopt him. Attorney Petrillo told the trial court that T.M.S. "was very eloquent for his age" and was "as clear as a 12 year old could be about his feelings and what he would like in his life." N.T., 4/10/19, at 108. Attorney Petrillo stated: "[T.M.S.] told me that he feels that his dad does not love him[,] and he wants him out of his life. He does not want any further contact with [Father]." *Id.* We conclude, because there is no conflict in T.M.S.'s best interests and T.M.S.'s preferred outcome, the requirements of *L.B.M.* and *T.S.* have been met. *See In re: Adoption of K.M.G.*, ___ A.3d ___, 2019 PA Super 281 (Pa. Super. filed September 13, 2019) (*en banc*) (this Court has authority to raise, *sua sponte*, the issue of whether the trial court appointed any counsel for the child).

Mother testified that T.M.S., her only child, is in sixth grade and resides with her and Stepfather. N.T., 4/10/19, at 7–8. Mother, who met Father when she was fifteen years old and in the eighth grade, never married Father, but they were in a relationship for approximately seven years and resided together for two years until 2009, when T.M.S. was two years old. *Id.* at 8–9, 15. Mother and T.M.S. moved to Collegeville, Pennsylvania, in 2015, where they currently reside with Stepfather. *Id.* at 7, 9.

In 2010, Mother filed a complaint for custody of T.M.S. and subsequently agreed to an order whereby she transported T.M.S. to Father on Tuesdays and Fridays, picked him up after two or three hours, and returned T.M.S. to her home. N.T., 4/10/19, at 9. Mother testified the custody schedule failed because Father was not present on many occasions, he would be present but "high" on drugs, or Father would have to go somewhere and would leave T.M.S. in his mother's care. *Id.* at 10. Moreover, Father often had people in his home, whom Father claimed he did not know, and he would not allow Mother to come to his house because it was "not safe." *Id.* at 10, 11.

On October 26, 2011, Mother filed a petition to modify custody. N.T., 4/10/19, at 11. Mother testified that Father was unable to parent T.M.S. because Father was addicted to heroin, Oxycontin, and Xanax. *Id.* at 12. In 2012, the trial court awarded Mother sole legal custody and primary physical custody of T.M.S. *Id.* Thereafter, Mother arranged supervised visits between Father and T.M.S. in a public place. *Id.* at 12–13. Mother asserted that during

the visits, Father was uninterested in T.M.S. and instead, verbally attacked Mother or questioned her about her personal life. *Id.* at 13. Therefore, Mother enlisted her family to meet Father with T.M.S. until her family members, as well, became uncomfortable with the situation. *Id.* Mother told Father that if he wanted to see T.M.S., he would have to file a custody modification petition. *Id.*

At that time, Father, who did not work and sold illegal drugs, was intermittently paying child support for T.M.S. N.T., 4/10/19, at 13, 15. He did not graduate from high school, but obtained a Graduate Equivalency Diploma online. *Id.* at 14. When Father fell behind in his support payments, he faced incarceration, and asked Mother for financial assistance. *Id.* at 13. On four occasions, the trial court held Father in contempt and incarcerated him once for not paying child support for T.M.S. *Id.* at 14. When Father was imprisoned for another crime, Mother decided not to seek additional child support from Father. *Id.*

Mother and Father last corresponded *via* text messages in 2013 or 2014. N.T., 4/10/19, at 16, 51. In the final text message, Father asked Mother to give him $10 when she transported T.M.S. to Father's home. Mother refused because she believed Father would use the money to buy illegal drugs. *Id.* Mother stated that because Father always asked her for money and could not care for T.M.S., there was no reason for her to continue transporting T.M.S. to visit Father. *Id.* at 16-17. Mother claimed that because Father sold illegal

drugs, he frequently changed cellular telephones; for this reason he utilized the cellular telephone of his mother ("Paternal Grandmother") to correspond with Mother. *Id.* at 17. Father admitted utilizing Paternal Grandmother's cellular telephone to text Mother. *Id.* at 91. In one of the messages, Mother described to Father how to file a custody modification petition. *Id.* at 17-18, 91–92.

Father last saw T.M.S. in a park in 2013 or 2014, more than five years prior to the hearing. N.T., 4/10/19, at 18. Thereafter, Father did not send T.M.S. any cards, letters, Christmas gifts, or pictures, nor did he request pictures of T.M.S. *Id.* at 18–19. On one earlier occasion, Christmas Day 2013, Father arrived fifteen minutes late at the Limerick Bowling Alley to meet Mother and T.M.S. with what Mother believed were needle track marks in his arm. *Id.* at 19.

During Father and Mother's relationship, Father was physically abusive toward Mother when she directed him to leave their house. N.T., 4/10/19, at 19-20. Father threw a television to the ground and threw something at Mother, hitting the light above her. *Id.* at 20. Father picked up the broken glass and threw it at Mother's face as she held T.M.S. and shielded his head. *Id.* On another occasion, Father shoved Mother off of the deck, blocked her automobile, kicked her car's doors, and dented her car's hood with his hands. *Id.* at 20-24. The trial court admitted the photographs of the damaged vehicle. *Id.* at 23, 51. At the time of the incident, T.M.S. was at the maternal

grandparents' home. *Id.* at 21. Mother attempted to defend herself until her parents arrived and called the police. *Id.* at 21. Police filed an incident report, but Mother testified she did not pursue charges against Father regarding the incident because "the police said I could get in trouble for defending myself." *Id.* On an earlier occasion, when T.M.S. was an infant and Mother was holding him, Father told Mother, "[Y]ou are lucky you are not a dude; I would punch you right in the f---in' mouth," and he punched his hand past Mother's head and into the wall. *Id.* at 22. On yet another occasion, when T.M.S. was approximately two years old and just learning to speak, Father made a video of himself holding T.M.S. and instructing T.M.S. to say, "[M]ommy is a bitch." *Id.* at 3–5, 22.[2] Father admitted these behaviors and incidents. *Id.* at 93–94.

Mother testified that when T.M.S. was approximately five years old, Father bought the child a "BB" handgun, which Mother described as a poor, ill-advised gift. N.T., 4/10/19, at 24. Mother took the BB gun to the police station and disposed of it. *Id.* at 24–25. Father also gave T.M.S. a cellular telephone, which Mother found inappropriate and threw away. *Id.* at 25-26. Father opined that the person in the videos "is not who I am today." *Id.* at 94.

---

[2] Father stipulated that the trial court could consider the oral summary by counsel for Mother and Stepfather as to what the video would show. N.T., 4/10/19, at 5.

Mother met Stepfather, who does not have children of his own, at the end of 2011, and she introduced Stepfather to T.M.S. three months later. N.T., 4/10/19, at 26, 50. Mother and Stepfather married in September of 2018, and Mother plans to change her surname. *Id.* at 26. T.M.S. desires to change his last name as well. *Id.* at 26-27. T.M.S. utilizes Stepfather's last name on his schoolwork, despite Mother's instruction not to do so. *Id.* at 27. Stepfather attends T.M.S.'s school conferences and meetings and pays for T.M.S.'s needs, such as clothing, doctors' appointments, school lunches, toys, and entertainment. *Id.* at 27, 48. Stepfather also pays for a babysitter for T.M.S. when needed or babysits T.M.S. himself. *Id.* at 27-28. Stepfather assists T.M.S. with his homework and school projects. *Id.* Stepfather, who is an electrician, plays videogames with T.M.S., takes him fishing, and enjoys going to fun places with T.M.S. *Id.* at 28, 29, 47. Stepfather provides T.M.S. with guidance, and they eat dinner together with Mother as a family. *Id.* at 28. T.M.S. calls Stepfather "Dad." *Id.* at 28-29, 47. Every day when T.M.S. leaves the house, T.M.S. and Stepfather say, "I love you." *Id.* at 29, 48. Stepfather also pays for the family's vacations, such as a trip to visit Mother's grandparents in Arizona. *Id.* at 29–30. T.M.S. wrote a letter in school describing Mother and Stepfather as his "mom and dad." *Id.* at 31.

T.M.S. has Attention Deficit Hyperactivity Disorder, and he attends therapy to learn how to refocus his energy and discuss his life situations. N.T., 4/10/19, at 31. T.M.S.'s therapist told Mother that T.M.S. has anger and fear

regarding Father, and he does not intend to meet him. ***Id.*** T.M.S. does not remember Father, and Mother does not believe that T.M.S. would recognize Father. ***Id.*** at 32. Mother opined that termination of Father's parental rights would serve the physical and emotional needs and welfare of T.M.S. ***Id.*** at 32–33.

Mother lived in Limerick for seven years and then in Collegeville since September of 2015. N.T., 4/10/19, at 32. Her parents lived in Linfield, Pennsylvania, in the same home for thirty years, and they had the same telephone number during that time, with which Father was familiar. ***Id.*** Mother had the same telephone number since 2014, used the same e-mail address for six or seven years prior to the hearing, and has a Facebook account. ***Id.*** at 32–33. On cross-examination by T.M.S.'s counsel, Mother testified that she had not had any contact from Father's family, although they continued to live in the same residence in Pottstown, Pennsylvania, where they resided when Mother and Father lived together. ***Id.*** at 34.

Mother confirmed that T.M.S.'s counsel had come to her home the week prior to the hearing to visit with Mother, Stepfather, and T.M.S., and had spent time alone with T.M.S. in his room. N.T., 4/10/19, at 34. Mother did not pursue criminal charges against Father for any incident, and although Father represented that he completed rehabilitation, she does not believe him. ***Id.*** at 35. Mother has had sole legal custody since 2012. ***Id.***

On cross-examination by Father's counsel, Mother acknowledged that she had formerly taken T.M.S. to a park to visit with Father and Paternal Grandmother on many occasions. N.T., 4/10/19, at 38. Mother testified that Father had filed a petition to modify custody in 2014 but had not appeared at the hearing. *Id.* at 38–39. He also filed a petition to modify custody in 2018. *Id.* Mother requested a stay of Father's 2018 modification petition so that she could file her termination petition. *Id.* at 40. Mother admitted that she opposed Father's 2018 modification petition. *Id.* at 41.

Father testified that he was thirty-two years old at the time of the hearing, twenty years old when T.M.S. was born, and fourteen years old when he began dating Mother; the pair separated at age twenty-two. N.T., 4/10/19, at 53. Father admitted his past drug use and revealed his incarceration in 2015 and 2016. *Id.* at 56. After his release from prison in 2016, Father completed a thirty-three-day inpatient rehabilitation at Livengrin in Bensalem, Pennsylvania. *Id.* at 56, 80–81. Father acknowledged that he had completed dual-diagnosis treatment at Creative Health Services ("CHS"), but he asserted that he did not have a history of mental illness; he could not explain why CHS required him to complete the dual-diagnosis program. *Id.* at 56, 79–80. Father testified that since 2016, he has attended Connection Training Services ("CTS") once per week for one hour of individual counseling and one-half-hour of group counseling. *Id.* at 57. At the time of the hearing, Father was on probation for a period of ten years, and he is required to undergo random

urine drug screens. *Id.* at 57, 82. Father testified that he has not had a "dirty" urine sample since his release from prison in 2016. *Id.* at 57. He admitted that he takes methadone and candidly admitted receiving treatment for drug addiction that "didn't work out" due to his many relapses. *Id.* at 81, 97–98. Father stated that he participates in a parenting class with Montgomery County Children and Youth Services on a biweekly basis, he completed Rise Above, Court Reporting Network ("CRN") in 2009, and safe driving school for a 2008 DUI. *Id.* at 57–58, 80–81.

Father testified that he arrived late for the custody-modification hearing in 2014 because he was delayed by an accident, and upon his tardy arrival, the judge told him he "lost [his rights]" by arriving late. N.T., 4/10/19, at 60. Father explained that he then "went on a downward spiral" and started using drugs, which led to his criminal convictions and incarcerations. *Id.* Father maintained that he wanted to achieve sobriety for one and one-half years before seeking visitation with T.M.S. *Id.* Father also averred that his prior attempts to pursue custody all failed. *Id.* at 61.

Father explained that he gave T.M.S. the BB gun because his father had presented him with a gun and trained him in gun safety when he was six years old, and he wanted T.M.S. to be similarly trained at a young age. N.T., 4/10/19, at 61–62. He admitted, however, that his father was imprisoned for murder "with a handgun." *Id.* at 98–100. Father testified that Mother's repeated refusals of contact with T.M.S. five years earlier prompted his

conclusion that "there was no point in trying" to contact T.M.S. *Id.* at 63. Father believed that if he sent T.M.S. a letter at the maternal grandparents' address, which was the only address knew, T.M.S. would not receive it. *Id.* at 63–64. Father stated that Mother did not permit Father's name to be spoken in her home. *Id.* at 64.

Father admitted he was "doing pills" on the aforementioned video, and represented that he did them "all the time." N.T., 4/10/19, at 64–65. Father also acknowledged telling T.M.S. to call Mother a "bitch" on the video, which he admitted was "not right," but he maintained it was an "isolated incident." *Id.* at 64. Father admitted that he had punched the closet and threatened Mother that if she "were a dude, I would hit you." *Id.* at 65. Father emphasized that the incidents occurred when he was a teenager. *Id.* Father admitted that Mother told him to leave their home when they lived together because he refused to stop seeing "Callie," another woman. *Id.* He further admitted punching Mother's car and denting it.

Father testified that he contacted Mother about T.M.S. until he no longer had a current telephone number for her. N.T., 4/10/19, at 69. Father claimed that he did not go to the maternal grandparents' home because he feared they would call the police. *Id.* Father asserted that he was focused on completing his rehabilitation programs and counseling and that he had been employed as a landscaper for the past three years. *Id.* at 69–70.

Father stated that he lives in the Pottstown School District in a three-bedroom home with his girlfriend, Lindsey Tuzzi. N.T., 4/10/19, at 70–71, 73. Father's brother occasionally resides with Father and has a separate bedroom. *Id.* at 70. Father pays the mortgage and the bills. *Id.* Paternal Grandmother lives with her boyfriend, which is three minutes away from Father's home. *Id.* Father has health insurance through the Commonwealth of Pennsylvania. *Id.* at 71. In 2018, Father served his petition for modification of the custody order by searching Mother's address on the Internet, went to Mother's home with his girlfriend, and served the petition on Stepfather. *Id.* 71-72. Father admittedly had the address where T.M.S. was living since he served the petition, but he did not try to mail T.M.S. a letter or a card, believing that Mother would immediately throw them away. *Id.* at 72. Father stated that he had been drug-free without relapse for four years. *Id.* at 72-73. Father did not present proof of his completion of the various programs he described participating in except a letter dated November 3, 2018, admitted into evidence. *Id.* at 58. He testified, "I did not bring [the documents] today." *Id.* at 73.

Ms. Tuzzi, employed at a Sunoco gas station, has a previous criminal conviction for theft. N.T., 4/10/19, at 74. Despite Father's testimony that Ms. Tuzzi does not have drug or mental health issues, Father admitted that she was arrested with Father "where [they] had a bunch of heroin . . . ." *Id.* at 75, 96. Father claimed that he placed the syringe found in Ms. Tuzzi's

purse. *Id.* at 96. Ms. Tuzzi remained on probation at the time of the hearing. *Id.* at 74, 96.

On cross-examination by counsel for Mother and Stepfather, Father admitted that he last saw T.M.S., who is now twelve, when the child was three years old, and that he does not know his son. N.T., 4/10/19, at 78. Father stated that he filed the petition for modification of custody because he wanted to get to know T.M.S. and find out "what [T.M.S.] is into." *Id.* The trial court questioned Father about Father's parenting during the period between March of 2018, when Father filed his petition for modification of custody, and September of 2018, when Mother and Stepfather filed the termination petition. *Id.* at 101. Father admitted he did not pay any child support or attempt contact. *Id.*

At the close of testimony, the trial court conducted a colloquy of T.M.S.'s legal-interests counsel, Attorney Petrillo. *Id.* at 106–110. Attorney Petrillo testified that Mother and Stepfather satisfied T.M.S.'s needs, and they provide him with love, stability, and everything he needs to be successful. *Id.* at 109-110. Attorney Petrillo testified that Father had not attempted to parent T.M.S. in the six months preceding the filing of the termination petition or, indeed, anytime before that. *Id.* at 110. She testified that Father's environment would not be conducive to T.M.S.'s success. *Id.*

At the close of the hearing on April 10, 2019, the trial court dictated its findings into the record as support of its written decree. On May 10, 2019,

Father filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925. The trial court relied on its dictated findings for its Pa.R.A.P. 1925(a) opinion. N.T., 4/10/19, at 111–122.

In his brief on appeal, Father raises two issues:

1. Did the trial court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) where [Mother and Stepfather] failed to prove by clear and convincing evidence that [Father] evidenced a settled purpose of relinquishing his parental claim and/or failed or refused to perform parental duties?

2. Did the trial court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) where the evidence at trial failed to establish by clear and convincing evidence that the conditions and causes of any incapacity, abuse, neglect, or refusal to parent by [Father] could not or would not be remedied?

Father's Brief, at 6.[3]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9

_____

[3] Father has not challenged the sufficiency of the evidence to support the termination of his parental rights under Section 2511(b) in his concise statement, his statement of questions involved, or his brief. We observe, however, that the trial court conducted a full inquiry regarding the requirements of Section 2511(b) and found those requirements satisfied. N.T., 4/10/19, at 119–122. For the reasons expressed by the trial court, *infra*, we agree that Mother and Stepfather satisfied the requirements of 23 Pa.C.S. § 2511(b).

A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon Mother and Stepfather, as petitioners, to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction,

without hesitance, of the truth of the precise facts in issue.'" *Id.* at 276 (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the case *sub judice*, we consider Section 2511(a)(1), which provides, in relevant part, as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The

court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

We have explained that the focus in terminating parental rights under Section 2511(a) is on the parent. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when

- 17 -

considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with the mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

Father argues that he exercised reasonable firmness in his attempts to see T.M.S. during the statutory period, and that Mother precluded him from doing so. Father's Brief, at 10, 13-16, 19.

The trial court provided its findings regarding Section 2511(a)(1) and (b), as follows:

Under ground 2511(a)(1)[,] I have to consider whether [Father] failed or refused to perform his parental responsibilities for the six-month period prior to the filing of this petition. So[,] as I stated earlier in my questions of [Father], the petition was filed on September the 1st, 2018, so the time period at issue here is that of March 1, 2018, to September 1, 2018.

- 18 -

During that six-month period[,] I have to determine whether or not [Father] evidenced what they call a settled purpose of relinquishing a parental claim.

* * *

In this case[, Father] last saw [T.M.S.] sometime between 2013 and 2014.

[Mother] in this case bears the burden of proof for each element by a standard of clear and convincing evidence. In interpreting Pennsylvania law, the Superior Court of Pennsylvania has identified certain what they call irreducible minimum requirements that all children are entitled to from their parents, including adequate housing, adequate clothing, food, love, and support. Those concepts are taken from the 1995 case *In re: Diaz*, [669 A.2d 372 (Pa. Super. 1995)].

The necessary implication then when you look at these factors is a parent who cannot or will not meet those minimum requirements—remember I said adequate housing, clothing, food, supervision, support,—within a reasonable time may properly have their parental rights terminated. That sentiment is taken from the 1990 case of *In re: J.W.*, [578 A.2d 952 (Pa. Super. 1990)].

* * *

All of these cases that I have just mentioned make clear that children have rights. [T.M.S.] has rights here. The emphasis in the cases that I have mentioned focus[es] on parents providing housing, clothing, food, supervision, support, and love.

Now, the Supreme Court of Pennsylvania has held that it is not a violation of constitutional rights for an individual's parental rights to be terminated due to the parent's mental disability or handicaps that prevent the parent from providing proper care for the child. That is from the 1978 case of *In re: William L.*, [383 A.2d 1228 (Pa. 1978)].

In this matter[,] I heard very credible testimony from [Father] that he did complete, although there is no documentation to that effect from the facility, but he does have[,] according to

- 19 -

[Father's Exhibit] F-1[,] that treatment was provided and completed for dual diagnosis therapy.

Those of us who have been involved in working with people with substance abuse issues know that dual diagnosis means two diagnoses. There are two [diagnoses,] side by side, usually involving mental health in addition to the addiction of whatever that is.

I did hear testimony from [Father] that he does not have mental health issues. Lacking any contradictory evidence, I have to believe him. So[,] in this matter[,] I will not consider the disability of [Father] as a factor in this matter.

I will, however, consider [Father's] drug use as a factor. This [c]ourt heard credible evidence regarding drug use by [Father]. I understand that according to Mother's Exhibit 8[,] [Father] is placed on addict supervision[,] which requires random urinalysis, but that goes as far as starting, I believe, in 2016. As I stated earlier, there was uncontradicted evidence that the last time [Father] saw [T.M.S.] was in 2013 or 2014.

Regardless, this [c]ourt heard very credible, convincing evidence from [Father's] testimony that he felt he needed to be— it needed to be the right time before he could get reinvolved in [T.M.S.'s] life. I want to make sure I use the correct wording here. [Father] testified that he purposely did not want to reunite with his son only to relapse, and so there was the chosen time period by [Father] without significant reason for that choice, but the chosen time period of one-and-a-half years of sobriety before determining that he could be involved in [T.M.S.'s] life.

So[,] looking chronologically at the time periods that may be evidence of [Father's] reasoning for finally going to court and getting the custody petition in 2018, . . . I get it. And I also heard very clearly [Father's] testimony that he is doing the very best he can. I believe him. I believe that he is doing the very best he can.

But the major thing and the reason why we are all here today is because of [T.M.S.] In that one-and-a-half-year time period[, which Father arbitrarily set,] what is [T.M.S.] supposed to do? What is he supposed to use for food? What is he supposed

- 20 -

to use for clothing? What is he supposed to use for support? What is he supposed to use for love and supervision? Life goes on.

I also heard testimony from [Father] that he was incarcerated for a period of time. Other than [Father's] testimony about his term of imprisonment, this [c]ourt did not receive additional evidence one way or another, so in the realm of my decision today, I will not incorporate his period of incarceration as a factor in this.

I [do], however, find neglect. It may be tied into the drug use, but since 2013, 2014[,] the neglect is the glaring factor that just stands out with this [c]ourt. Love drives people to do many things. If the love and concern are really there, parents are over at the counter in the administration office of the courthouse every week filing repeated petitions for custody. Having sat in the family law division for two years, that's what people do. They come back over, over, and over. They don't just throw up their hands and give up, because it is not helping the child to give up. When you give up on your child, that's called neglect, because who else is supposed to take care of him? Who else is supposed to love him? Who else is supposed to go to parent-teacher conferences? Who is supposed to take him to church? Who is supposed to do all of these other things? Because life goes on.

I find in this matter that [Section 2511(a)(1) has] been proven by clear and convincing evidence. Having done so, I will next address the needs and the welfare analysis under Section [2511](b).

. . . Our Supreme Court in the case of *In re: K.M.*, [53 A.3d 781, 791 (Pa. 2012)], says that if grounds for termination under subsection (a) are met, and they have been, the [c]ourt shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. So those issues include intangibles, love, comfort, security, and stability.

In a 1993 case that's cited at *In re: E.M.*, 620 A.2d 481[, 485 (Pa. Super. 1993),] the Court held that determining a child's needs and welfare requires considering those emotional bonds between a parent and a child. The utmost attention has to be made by this [c]ourt to discerning the effect of permanently severing any parent-child bond on the child.

In considering [T.M.S.'s] needs and welfare, this [c]ourt must consider the role of a parental bond in his life. I am required by prior case law to fully consider whether a parental bond exists to such an extent that severing this natural relationship would be contrary to the needs and the welfare of [T.M.S.].

The Pennsylvania Supreme Court has observed a delicate balance between preserving the family unit and presenting a state of constant uncertainty and limbo for a child who has no reasonable prospect of permanently reuniting with their natural parent.

In this case, credible testimony clearly establishes that there is no significant bond between [T.M.S.] and [Father], especially given the time period of absence in [T.M.S.'s] life.

Therefore, I find from the evidence and the testimony that termination of [Father's] rights best serves the needs and the welfare of [T.M.S.] and that termination of the parental rights will not irreparably harm [T.M.S.]

In addition, I have heard testimony that [T.M.S.'s] home life is one that reflects love, stability, and security.

On this date, April the 10th, 2019, based upon the facts presented and the law, I must enter a final decree terminating the parental rights of [Father] to [T.M.S.]

[Mother] has established a legal basis for terminating the parental rights under Section 2511(a)(1) and (a)(2). Accordingly, it is hereby ordered, adjudged[,] and decreed that the parental rights of [Father] to [T.M.S.] are forever terminated. The adoption of [T.M.S.] may continue without further notice to or consent of [Father].

Custody of [T.M.S.] shall remain with [Mother], which is by this decree specifically authorized to consent to any necessary routine and/or emergency medical, dental and/or mental health treatment for [T.M.S.], and to consent to his adoption without further consent of or notice to [Father].

N.T., 4/10/19, at 113–121.

We conclude that the testimonial evidence supports the trial court's determination that far in excess of six months preceding the filing of the involuntary termination petition on September 1, 2018, Father has not performed his parental duties. *B.,N.M.*, 856 A.2d at 854-855. Indeed:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, **even in difficult circumstances**. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved **by waiting for a more suitable or convenient time** to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*B.,N.M.*, 856 A.2d at 855 (emphases added; internal citations omitted).

The trial court considered Father's abandonment of T.M.S., Father's lack of contact with T.M.S., and his explanation for both. *Charles E.D.M.*, 708 A.2d at 92. The trial court found that Father's reasons for not providing any care, support, or contact with T.M.S. were his own desire to be "clean" of drugs for an arbitrary period of one and one-half years before attempting contact with T.M.S. and his fear that Mother would reject his contact attempts. The trial court found that Father failed to perform his parental duties for T.M.S. for the requisite six-month period. Instead, Father relied upon Mother and Stepfather to provide for T.M.S.'s needs and welfare since at least 2013 or 2014. Moreover, the testimonial evidence supports the trial court's conclusion that T.M.S. has no bond with Father.

Although Father professes fondness for T.M.S. and a desire "to get to know" him, this Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re: Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *B.,N.M.*, 856 A.2d at 856.

After our careful review of the record, we conclude that the trial court's decision to terminate the parental rights of Father is supported by competent, clear and convincing evidence of record. *Adoption of S.P.*, 47 A.3d at 826-827. Thus, we find no abuse of discretion in the trial court's termination of Father's parental rights to T.M.S. For the reasons expressed by the trial court, we affirm.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/22/19